IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Curtis Ray Ballou, | ) | CIVIL ACTION NO. 9:12-1595-MGL-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Stephen Fuller, Steve Adwell, Cytha | ) | |
| McFadden, Chust Lister, Peter Schafer, | ) | |
| Dana Smith, Bruce Mclease, Steve Green, | ) | |
| and Pete Meffert | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983.

Plaintiff, an inmate with the Georgia Department of Corrections (GDC), is presently detained at the

Columbia Regional Care Center (CRCC) in South Carolina, where he has been sent by the GDC for

housing after being deemed a danger to himself or others. CRCC is a private health care detention

facility which provides health care to GDC inmates pursuant to a contract between CRCC's operating

corporate entity and the GDC. See Defendants Exhibits 1 (Adwell Affidavit) and 2 (Shafer

Affidavit). Plaintiff alleges violations of his constitutional rights by the named Defendants, all

employees of CRCC.

The Defendants filed a motion for summary judgment pursuant to Rule 56,



Fed.R.Civ.P., on November 1, 2012.[1]  As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on November 7, 2012, advising Plaintiff of the importance of a motion for summary judgment and of the need for him to file an adequate response.  Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case.  Plaintiff thereafter filed a memorandum in opposition to the Defendants' motion , with attached exhibits, on November 30, 2012.

The Defendants' motion is now before the Court for disposition.[2]

## **Background and Evidence**

Plaintiff alleges in his verified Complaint[3] that when he arrived at CRCC he was placed in a strip cell on orders of the Defendants Adwell and McFadden, which precluded him from having any kind of personal property to include legal materials.  Plaintiff also alleges that he was provided with a shave and a haircut only once a month.  Plaintiff alleges that Adwell and McFadden had their "staff" tamper with his mail and legal mail, including opening letters to him from the Court, and that he was denied his religious rights because he was not allowed to have a necklace with a cross made out of plastic.  Plaintiff alleges that he has asked the Defendant Chaplan Steve Green

---

[1]The Defendants supplemented their motion with affidavits from Cynthia McFadden and Bruce Mclease on December 6, 2012, after the Court granted Plaintiff's motion to re-add these two individuals as party Defendants in the case.  Plaintiff had earlier withdrawn his claims against these two Defendants, but subsequently asked that they be reinstated.  See Court Docket Nos. 44 and 56.

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C.  The Defendants have filed a motion for summary judgment. As this is a dispositive motion this Report and Recommendation is entered for review by the Court.

[3]In this Circuit, verified complaints by pro se litigants are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).



"many" times for the return of his necklace, but that his necklace has yet to be returned and that Green also "refuses to let patients on Unit 3 (where Plaintiff is presumably being held) have religious services. Plaintiff alleges that after Green told him that no patient would be allowed to perform services or possess religious material, he went to the Defendant Chief Security Officer Bruce Mclease, who also denied him his necklace. Plaintiff further alleges that patients at CRCC (presumably including himself) "are being physically/mental abused by staff on [a] daily basis".

Plaintiff alleges that he has been denied "medical attention" by the Defendants Nurse Practitioner Dana Smith and Medical Doctor Peter Schafer. Plaintiff alleges that when he arrived at CRCC, he was seen by Dr. Schafer but was only asked "standard" questions. Plaintiff alleges that prior to his arrival at CRCC, he had bitten off his right ring finger and had been prescribed pain medication (Neurontin), but that his medication was discontinued by CRCC. Plaintiff alleges that the "suffers from severe back and nerve pain in fingers", and that he "should not have been taken off his [Neurontin] pain medication . . . .". Plaintiff alleges that he filed many "sick calls" with the Defendants Smith and Schafer, but received no response. Plaintiff also alleges that because of a previous eye injury, he is entitled to have "medical prescribed tinted eyeglasses", and that pursuant to a previous medical "profile" he is entitled to have in his possession "soft-shoes", as well as a "knee brace". Plaintiff alleges that all of these items were denied to him upon his arrival at CRCC by the Defendants Smith and Schafer.

Plaintiff also complains that inmates housed on twenty-four hour lockup status (which includes himself) are only given two and one half hours of outside exercise activity per week, and that at the time this action was filed he was having to do his outside exercise in "shower shoes", when he should have been allowed to have tennis shoes. Plaintiff alleges that this deprivation is pursuant



to orders of the Defendants Adwell and McFadden.

Plaintiff also complains that the CRCC does not have any type of law library, which is denying him meaningful access to the courts. Plaintiff further states that he is being improperly forced to eat cold food, and that the Defendant Food Administrator Pete Meffert told him he would check into how the food was being prepared and to also make sure that it was meeting proper nutritional standards, but that Meffert has failed to do so. Plaintiff alleges that the Defendant Steven Fuller, CEO of the CRCC, is responsible in his supervisory capacity for all of these alleged deprivations, including that Fuller has failed to make sure that his staff and employees are properly trained. Plaintiff seeks monetary damages, together with specified declaratory and/or injunctive relief. [4]

Plaintiff has attached to his Complaint copies of several Stage 1 Grievance forms as well as Patient Communication forms. A review of these attachments reveals that in response to a grievance about his Neurontin, Dr. Schafer responded that a different medication (Nozizyptaline) is more effective for Plaintiff's phantom limb pain than the Neurontin he was on, which is used for mood stabilization. In response to a grievance complaining about being denied access to legal case materials, Defendant McClease responds by telling Plaintiff to submit a request to "Sgt. Reynolds" to obtain any active legal documents from the Georgia Department of Corrections. Plaintiff was also

---

[4]It is noted that, in Plaintiff's response in opposition to summary judgment, he discusses an incident where he was allegedly attacked by another inmate on July 12, 2012 and suffered a dislocated shoulder and two chipped bones. See Court Docket No. 69-1, pp. 7, 33. Plaintiff also states that on October 23, 2012, despite his shoulder being broken in two places, his hands were handcuffed behind his back which resulted in pain. See Court Docket No. 69-1, pp. 32-33. Plaintiff also states that he had surgery on his shoulder on November 6, 2012. See Court Docket No. 69-1, p. 31. All of these statements/allegations post-date Plaintiff's Complaint, and are not part of the claims being asserted in this lawsuit.



asked to provide proof of all active court cases and time sensitive legal responses. In response to a grievance wherein Plaintiff complains about CRCC withholding some magazines from him, a "Mr. Rose" responds that Plaintiff's magazines were being held in Plaintiff's "property" and would be issued to him once his custody status changed. In a Patient Communication form addressed to Dr. Schafer, wherein Plaintiff asked why his Neurontin is being withheld from him, Dr. Schafer again responds that Nozizyptaline is more effective for his amputation pain, and that Neurontin is not indicated for treatment of this injury. Finally, in a Patient Communication form wherein Plaintiff asked about his religious necklace, the Defendant Mclease responds that necklaces are not allowed on Unit 3 due to safety concerns. See generally, Verified Complaint with attached exhibits.

        In support of summary judgment in the case, the Defendant Steven Adwell has submitted an affidavit wherein he attests that he is the Facility Administrator of the CRCC, a private health care detention facility operated by GEO Care of South Carolina, Inc. (GEO). Adwell attests that GEO contracts to provide detention health care, nursing care, some physician care, and security services at CRCC for numerous government agencies, including the GDC. Adwell attests that Plaintiff was detained at CRCC pursuant to GEO's contract with GDC, having been transferred to CRCC from GDC on May 3, 2012 after biting off his fingers. Adwell attests that Plaintiff's medical/mental health conditions include diagnoses of borderline and anti-social personality disorder, self-injurious behavior, and mood disorder, not otherwise specified. Plaintiff also has a history of assaulting staff, destroying furniture, making serious cuts on his arm requiring thirty-two staples, and misusing medications. Adwell attests that, as facility administrator, he plays a supervisory role with respect to Plaintiff's detention at CRCC, but is not directly involved in Plaintiff's care and treatment.

        Adwell attests that when Plaintiff arrived at CRCC on May 3, 2012, he was on suicide



watch.  Adwell attests that the standard of care for new facility patients on suicide watch is that they be placed in a "strip-cell" for their own safety during an observation period, which allows CRCC to evaluate the patient and formulate a plan on how best to care for them.  Adwell attests that upon arrival, Plaintiff was placed in a strip-cell and provided with a mattress, a suicide blanket and a suicide gown, which met the standard of care for a new patient on suicide watch.  Adwell further attests that, because of Plaintiff's behavior problems and being a danger to himself and others, he is housed on Unit 3, which is CRCC's Special Management Unit.

With respect to Plaintiff's allegations in his Complaint, Adwell attests that he has never withheld or tampered with any of Plaintiff's mail, and that to his knowledge no CRCC staff has ever withheld or tampered with Plaintiff's mail at any time.  Adwell attests that because Plaintiff is an extensive "cutter" and has gone so far as to use things that he has hidden in his dentures to cut himself, that for his own safety he is not allowed to have a necklace at CRCC.  With respect to exercise, Adwell attests that security, behavior, and weather permitting, Plaintiff receives thirty minutes of outdoor recreational time in the morning and thirty minutes in the afternoon, five days a week.  If there are security, behavior, or weather concerns, Plaintiff may receive less on some days.  Adwell attests that CRCC brings in a barber to cut the inmates' hair and shave them, and that Plaintiff can request to see the barber for a haircut and shave, if he so chooses.  However, because Plaintiff is a suicide risk and an extensive cutter, he is not allowed to have a razor to shave himself because of the substantial risk that he would harm himself, or someone else.

With respect to access to legal materials, Adwell attests that CRCC employs an education specialist, who is available to assist inmates with their legal rights.  CRCC also provides its inmates with access to LexisNexis, including caselaw, statutes and regulations.  Adwell attests



that CRCC also follows a procedure and uses special equipment to ensure that inmates are served hot food, including that the food is served on insulated meal trays which keep food warm for two to three hours, while it usually takes less than ten minutes from the time the food leaves the kitchen until it is served to the inmates.  Adwell further attests that, from a facility administrator's standpoint, Plaintiff has been provided with appropriate access to religious services during his confinement at CRCC, and that the medical care provided to him was also appropriate.  Adwell notes that CRCC received the 2012 Program of the Year award from the National Commission on Correctional Health Care for the skilled long-term health care it provides.  See generally, Adwell Affidavit.

The Defendant Cynthia McFadden has submitted an affidavit wherein she attests that she is the Assistant Facility Administrator at CRCC, and that she holds a master's degree in social work and a Ph.D. in health sciences.  McFadden attests that she is familiar with the Plaintiff through her role as Assistant Facility Administrator and has played a supervisory role during his detention at CRCC, but has not been directly involved in Plaintiff's care and treatment.  McFadden further attests to all of the facts concerning the management of the facility, Plaintiff's placement upon arrival, and treatment thereafter as was attested to by Adwell in his affidavit.  McFadden attests that, from an Assistant Facility Administrator's standpoint, the care, services and treatment rendered to the Plaintiff at CRCC have been appropriate, and that neither she nor any other CRCC employee have taken any actions at any time to cause any harm to the Plaintiff or to violate any of his rights.  See generally, McFadden Affidavit.

The Defendant Peter Schafer has provided an affidavit wherein he attests that he is a physician and the Medical Director of the CRCC, and that as such he is responsible for writing policies and procedures, supervising the medical staff, providing direct patient care, and participating



on the leadership committee. Schafer attests that he his familiar with the Plaintiff through his role as Medical Director, and that Plaintiff was transferred from the GDC to the CRCC on May 3, 2012 after biting off his fingers. Schafer attests that Plaintiff's medical/mental health conditions include diagnoses of borderline and anti-social personality disorder, self-injurious behavior, and mood disorder, not otherwise specified, and that he is considered a psychiatric patient with a history of assaulting staff, destroying furniture, making serious cuts on his arm requiring thirty-two staples, and misusing medications. Schafer attests that because of Plaintiff's behavior problems and being a danger to himself and others, he is housed on Unit 3, which is CRCC's Special Management Unit.

With respect to Plaintiff's allegation that he should be on Neurontin for nerve and back pain, including the pain resulting from him biting off some of his fingers over the years, Schafer attests that Neurontin is an anti-convulsant, which can also be used to treat neuropathic pain. Schafer attests that Plaintiff did not come to CRCC from the GDC with a prescription for Neurontin, as he claims, and that there is no objective medical evidence that Plaintiff needs to be on Neurontin for any kind of pain. Schafer attests that Plaintiff does receive Prednisone, which is a corticosteriod, for inflamation and pain in his knee and back. With respect to Plaintiff's eyes, Schafer attests that he wrote a physician's order authorizing Plaintiff to receive any personal property, including tinted eyeglasses, from the GDC, and that Plaintiff has now received his tinted eyeglasses from the GDC and is wearing them. Schafer attests that he has also previously written an order for Plaintiff to have soft shoes, and that upon information and belief Plaintiff is currently wearing a knee brace.

Dr. Schafer attests that, in his opinion to a reasonable degree of medical certainty, Plaintiff has been provided with excellent medical care and treatment during his period of detention at the CRCC, and that none of the medical and nursing personnel at CRCC have taken any actions



at any time to cause any harm to the Plaintiff and have at all time acted in good faith towards the Plaintiff and been very attentive to Plaintiff's medical needs. See generally, Schafer Affidavit.

The Defendant Dana Smith, a Board Certified Acute Care Nurse Practitioner, had also submitted an affidavit attesting to the same medical history and facts as Dr. Schafer, and that in her opinion to a reasonable degree of medical certainty, all of the medical care and treatment provided to Plaintiff at CRCC has been appropriate and in compliance with the proper medical standard of care. See generally, Smith Affidavit.

The Defendant Steven Greene[5] has submitted an affidavit wherein he attests that he is a licensed and ordained minister, and is the Chaplin at CRCC where he provides religious services, arranges pastoral visits, provides spiritual counseling, and coordinates volunteer religious services for the patients/inmates. With respect to Plaintiff's allegations, Greene attests that, unfortunately, Plaintiff is a "manipulative individual". Greene attests that Plaintiff verbally assaulted him approximately six months ago[6] during which Plaintiff had a very aggressive and threatening tone and demeanor. Greene attests that Plaintiff accused him of lying to him and not giving him something that he had requested, allegations which were false. Greene further attests that he has never denied religious services to the Plaintiff, or to any other patient/inmate at CRCC, unless directed to do so by security personnel for safety/security reasons. Greene also attests that he does not have possession of the necklace Plaintiff references in his Complaint, has never seen this necklace, and that when he asked security personnel at CRCC about the necklace he was told that Plaintiff could not have a necklace for safety and security reasons.

---

[5]This Defendant's last name is misspelled "Green" in the caption of the Complaint.

[6]Greene's affidavit is dated October 29, 2012.



With respect to Plaintiff's complaint that he has refused to allow Plaintiff to perform or supervise religious services at CRCC, Greene attest that the standards and regulations of the correctional industry do not allow patients/inmates to perform or supervise religious services for safety/security reasons, and that it has been his experience that patient/inmates do not want to have other patients/inmates perform or supervise religious services. Greene attests that while he does not specifically recall ever refusing to allow Plaintiff to perform or supervise religious services at CRCC, it would have been entirely appropriate and not a violation of Plaintiff's rights to do so. See generally, Greene Affidavit.

The Defendant Peter Meffert has submitted an affidavit wherein he attests that he is the Food Service Manager at CRCC, and that in this position he oversees the operation of the kitchen, orders food, prepares food, checks food, and manages fifteen employees. Meffert attests that he is a Certified Dietary Manager (CDM), a Certified Food Protection Professional (CFPP), and a Certified Member of the Association of Nutrition and Foodservice Professionals, and that the food service and kitchen at CRCC is compliant with the regulations and guidelines of the South Carolina Department of Health and Environmental Control, the Office of the Federal Detention Trustee, and the Joint Commission, which is an accrediting organization.

Meffert attests that Plaintiff has made multiple complaints that his food is either cold or that the portions are too small, that he has investigated and responded to all of Plaintiff's complaints relating to his food, and that Plaintiff has never been served with cold food and the portions have always been appropriate. Meffert attests that the food's temperature is taken after it is cooked in the kitchen at CRCC, and then placed in individual insulated meal trays, which are then put in a cart specifically designed to transport food. Meffert attests that these insulated trays keep

10



food warm for two to three hours, even though it usually takes only between five and eight minutes from the time the food leaves the kitchen until it is served to the patients/inmates. Meffert attests that this procedure has been followed for all meals served to the Plaintiff at CRCC, and that the temperature of the food served to him has always been appropriate.

Meffert further attests that the master menu at CRCC is designed by a dietitian and that it rotates on a seasonal basis. The dietitian comes to CRCC every Monday and makes sure the meals being served are appropriate by checking portions, calories, and nutrition. Meffert attests that CRCC serves healthy meals to the patients/inmates that total between 2,600 and 2,900 calories per day, and that CRCC uses special portion-sized utensils to ensure that they are serving proper portions of food to the patients/inmates. Meffert attests that the portions of food served to the Plaintiff at CRCC have always been appropriate. <u>See</u> <u>generally</u>, Meffert Affidavit.

The Defendant Stephen Fuller has submitted an affidavit wherein he attests that he is the Senior Vice President of Human Resources for GEO, and works out of the corporate office which is in Boca Raton, Florida. Fuller attests that he does not have a role in the day to day operation of the CRCC or how it manages its inmates/patients. Fuller attests that he is not, and has never been, the CEO of the GEO Group, Inc., or of GEO Care of South Carolina, Inc., nor has he ever had any interactions with the Plaintiff or played any role in Plaintiff's confinement at CRCC or any other GEO facility. Fuller attests that he has no knowledge of any of the Plaintiff's allegations, and denies all of the allegations in the Complaint asserted against him. <u>See</u> <u>generally</u>, Fuller Affidavit.

The Defendant Charles Lister has submitted an affidavit in which he attests that he is Vice President of Security-Residential Treatment Services for GEO, and works at the corporate office in Boca Raton, Florida. Lister attests that he does not have any role in the day to day operation

11



of the CRCC or how it manages its inmates/patients, and has never had any interactions with the Plaintiff, nor played any role in Plaintiff's confinement at CRCC or any other GEO facility. Lister further attests that even though he is listed in the caption of the Complaint, he cannot find any allegations against him in the Complaint, but that to the extent there are allegations against him, he denies them. See generally, Lister Affidavit.

Finally, the Defendant Bruce McClease has submitted an affidavit wherein he attests that he is Chief of Security at CRCC, and that in this position he is familiar with the Plaintiff. McClease attests that because of Plaintiff's behavior problems and being a danger to himself and others, he is housed in Unit 3, which is CRCC's Special Management Unit. McClease attests that his job is to supervise and manage all security functions at CRCC, but that he is not responsible for, and has no role in, the provision of medical care and treatment to individuals detained at CRCC. As such, McClease attests that he was not directly involved in the care and treatment of the Plaintiff.

With respect to Plaintiff's allegations, McClease attests that regular mail is opened and checked by CRCC personnel for contraband, while legal mail is delivered sealed to the Plaintiff. McClease attests that he has never withheld or tampered with any of the Plaintiff's mail, and that to his knowledge no CRCC staff has ever withheld or tampered with the Plaintiff's mail at any time. McClease further attests that Plaintiff is an extensive "cutter" and has gone so far as to use things that he has found in his dentures to cut himself, and that Plaintiff is therefore not allowed to have a necklace because of his history of cutting and for his own safety and the safety of others. McClease also attests that security, behavior, and weather permitting, Plaintiff receives thirty minutes of outdoor recreational time in the morning and thirty minutes in the afternoon, five days a week, although he may receive less on some days depending on the three factors cited.



McClease attests that the security services provided at CRCC are very good, that there has been no exception where the Plaintiff is concerned, that any incidents involving the Plaintiff during his time at CRCC have been responded to and handled appropriately, and that neither he nor any other security personnel have taken any actions at any time to cause any harm to the Plaintiff. See generally, McCClease Affidavit.

As attachments to his response in opposition to the Defendants' motion for summary judgment, Plaintiff has provided numerous exhibits which include Patient Communication forms concerning requests on a variety of issues, grievance forms, Incident Reports, copies of Orders issued by this Court, and copies of discovery responses received from the Defendants, all of which have been reviewed. Plaintiff has also included additional copies of some of the exhibits originally attached to his Complaint.[7]

### Discussion

The Defendants have moved for summary judgment on all of the Plaintiff's claims. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d

---

[7]In a separate filing docketed February 13, 2013, Plaintiff offered to dismiss this lawsuit if the Defendants will agree to transfer him back to the Georgia Department of Corrections. See Court Docket No. 77.



872, 874-75 (4th Cir. 1992).  Further, while the Federal Court is charged with liberally construing

a complaint filed by a <u>pro se</u> litigant to allow the development of a potentially meritorious case, <u>see</u>

<u>Cruz v. Beto</u>, 405 U.S. 319 (1972); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), the requirement of liberal

construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts

which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material

fact where none exists.  <u>Weller v. Dep't of Social Services</u>, 901 F.2d 387 (4th Cir. 1990).

### (Medical Claim)

In order to proceed with his claim for denial of medical care as a constitutional

violation,[8] Plaintiff must present evidence sufficient to create a genuine issue of fact as to whether

any named Defendant was deliberately indifferent to his serious medical needs.  . <u>Estelle v. Gamble</u>,

---

[8]One argument Defendants make in their brief, <u>inter alia</u>, is that as employees of a private company, they are not subject to suit under § 1983 for claims of constitutional violations.  However, since whether, under the facts of this case, these Defendants could be deemed "state actors" is a convoluted issue, and since the undersigned has otherwise found for the reasons set forth in this opinion that the Defendants are entitled to summary judgment on the merits of Plaintiff 's constitutional claims, the "private actor" issue need not be decided. <u>Cf</u>. <u>Wilson v. Wyatt</u>, No. 09-543, 2010 WL 2902262, * 5 (D.S.C. June 23, 2010)[Declining to reach issue]; <u>Rhea v. Gerold</u>, No. 09-818, 2009 WL 1346139, at * 3 (D.S.C. May 12, 2009)[Addressing claims against Care Center by using § 1983 analysis]; <u>Munoz v. Providence Hospital, et al.</u>, No. 10-1899, 2010 WL 3699883 [same]; <u>Mathis v. GEO Group, Inc.</u>, No. 08-21, 2010 WL 3835141, at * 4 (E.D.N.C. Sept. 29, 2010)[Dismissing claim against GEO under <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971)]; <u>Holly v. Scott</u>, 434 F.3d. 287, 292, n. 3 (4th Cir. 2006)[Dismissing <u>Bivens</u> claim against GEO Group, which provided medical care to federal prison inmates at a privately run facility pursuant to a contract with the Federal Bureau of Prisons, but declining to decide whether employees of a private prison facility under contract with a state are subject to liability under 1983]; <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988)[Holding that private physicians that contracted with the State to provide medical care to prisoners were state actors because they were hired to fulfil an obligation - medical care - which was traditionally filled by the State]; <u>Jones v. Correctional Care Solutions</u>, No. 09-269, 2010 WL 2639788 at * 6 (D.S.C. June 7, 2010)[Declining to recommend dismissing Correctional Care Solutions on the basis that it did not act under color of state law], <u>adopted by</u>, 2010 WL 2926178 (D.S.C. July 23, 2010), <u>aff'd</u>, 397 Fed. Appx. 854 (4th Cir. Oct. 6, 2010).

14



429 U.S. 97, 106 (1976); <u>Farmer v. Brennen</u>, 511 U.S. 825, 837 (1994); <u>Sosebee v. Murphy</u>, 797 F.2d

179 (4th Cir. 1986); <u>Wester v. Jones</u>, 554 F.2d 1285 (4th Cir. 1977); <u>Russell v. Sheffer</u>, 528 F.2d 318

(4th Cir. 1975); <u>Belcher v. Oliver</u>, 898 F.2d 32 (4th Cir. 1990). Plaintiff has failed to submit any

such evidence. Rather, the evidence before this Court shows that Plaintiff has received continuous

and ongoing treatment for his medical complaints.

        The Defendant Schafer, a medical doctor, attests that Plaintiff suffers from a variety

of medical issues for which Plaintiff is being treated with various medications. With respect to some

of Plaintiff's specific complaints, Plaintiff's own exhibits (attached to his Complaint) confirm that

Dr. Schafer has determined that a different medication (which Plaintiff is receiving), rather than

Neuronton, is a more effective treatment for Plaintiff's phantom limb pain. <u>See</u> Plaintiff's Exhibits

(Stage 1 Grievance Form and Patient Communication Form).[9] Schafer further attests that Plaintiff's

tinted eyeglasses had to come from the GDC, but that he wrote a physician's order authorizing

Plaintiff to receive these eyeglasses, and that he has now received them and is wearing them. Schafer

also attests that he wrote an order for Plaintiff to have "soft shoes", and that Plaintiff is currently

wearing a knee brace. A second medical professional, the Defendant Dana Smith (a board certified

Acute Care Nurse Practitioner), attests to the same facts as does Dr. Schafer, and both of these

individuals attest to a reasonable degree of medical certainty that Plaintiff has been provided with

appropriate medical care and treatment during his period of detention in accordance with the proper

---

[9]As attachments to his response to summary judgment, Plaintiff has submitted some additional patient communication forms in which he complains about his need for surgery for a rotator cuff injury. <u>See</u> Plaintiff's Exhibits (Stage 1 Grievance Form dated September 19, 2012, Stage 1 Grievance Form dated October 16, 2012). This complaint post-dates the allegations of Plaintiff's lawsuit. In any event, these documents also indicate that Plaintiff had his rotator cuff surgery on November 6, 2012. <u>Id</u>.



15

standard of care.

None of the medical evidence provided to this Court shows that the Defendants Schafer or Smith, or any other medical personnel, have been deliberately indifferent to Plaintiff's serious medical needs. Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837. Plaintiff's claims in his Complaint that, upon arrival at CRCC, he was only asked "standard" questions by Dr. Schafer, and that Dr. Schafer should not have taken him off of his Neuronton pain medication, do not provide a basis for a deliberate indifference claim. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim absent exceptional circumstances]; Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]).  Plaintiff's additional allegations that he was denied his medical eyeglasses, soft shoes, and a knee brace upon his arrival at CRCC are also not a basis for proceeding with a constitutional medical claim.  It is undisputed that, upon his arrival at CRCC, Plaintiff was placed in a strip-cell, where he had no property.  However, Schafer attests that Plaintiff has now been provided with his eyeglasses and a knee brace, and that he has placed a medical order for Plaintiff to obtain his soft shoes.[10] Graham, 2009 WL 249779, at *4 [Where claim

---

[10]Several of Plaintiff's Exhibits attached to his response to summary judgment deal with these issues (among many other complaints not at issue in this lawsuit).  However, it is noted that Plaintiff was not transferred to the CRCC until May 3, 2012, and that he then submitted this Complaint complaining about his medical care and other issues only a month later (dated June 6, 2012, filed
(continued...)



involves a delay in, rather than outright denial of, the requisite treatment, Plaintiff must show that the delay "caused him to suffer a life-long handicap or permanent loss"].

While Plaintiff may not agree with the extent and nature of the medical care he has received, he cannot simply allege in a conclusory fashion that he did not receive constitutionally adequate medical care or attention, otherwise provide no supporting evidence, and expect to survive summary judgment, particularly when the Defendant medical professionals have attested to the quality of care provided and the other exhibits fail to establish a genuine issue as to whether a constitutional violation has occurred. Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]; Morgan v. Church's Fried

---

[10](...continued)
June 13, 2012). Hence, many of Plaintiff's exhibits, and the matters referenced therein, post-date the filing and claims of this lawsuit. Additionally, while many of these exhibits do reflect Plaintiff's frustration with delays in receiving requested items such as eyeglasses or shoes and Plaintiff's complaints of medical problems he is having, they also reflect that Plaintiff was receiving treatment (with which he was dissatisfied) and that Defendant Schafer responded to Plaintiff's Communication Form's and that he was either providing medications, ordering consults, or requesting Plaintiff's equipment (such as knee braces or glasses) subject to the approval of security. Plaintiff's dissatisfaction with how quickly or comprehensively his complaints were addressed do not state a § 1983 claim absent evidence of deliberate indifference to serious medical needs. Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1188-1189 (11th Cir. 1994)["An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"], overruled in part by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002). No constitutional violations are shown in the evidence before the Court. Cf. Davidson v. Desai, 817 F. Supp.2d 166, 188 (W.D.N.Y. 2011)[Granting summary judgment where "evidence in the record . . . fail[ed] to establish a material issue of fact as to whether Plaintiff, as a result of delays in obtaining proper prescriptive lenses, suffered from a serious medical condition."]; Graham v. Aponte, No. 08-308, 2009 WL 249779 at * 4 (E.D.Va. Feb. 2, 2009[Finding that Plaintiff's orthopedic condition did not rise to the severity necessary to show a serous medical need and "[m]oreover, [Plaintiff] does not allege, and medical records supplied by the Defendants do not indicate, that the four months it took for Plaintiff to be supplied with his orthotic shoes caused him to suffer a life long handicap or permanent loss."].



<u>Chicken</u>, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though <u>pro se</u> litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; <u>Levy</u>, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"].

       Plaintiff may, of course, pursue a claim in state court if he believes that the medical care he has received while at CRCC constitutes malpractice.  However, that is not the issue before this Court.  Rather, we are concerned only with whether a constitutional violation has occurred. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].  The evidence before the Court is insufficient to raise a genuine issue of fact as to whether any named Defendant was deliberately indifferent to Plaintiff's serious medical needs, the standard for a constitutional claim, and Plaintiff's federal § 1983 medical claim should therefore be dismissed.  See <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; <u>Baker v. McClellan</u>, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]; <u>Estelle</u>, 429 U.S. at 106 ["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].

<b>(Mail Privileges and Access to Court Issues)</b>

       Plaintiff alleges that the Defendants Adwell and McFadden allowed their "staff" to tamper with his mail, including opening letters to him from the Court.  Plaintiff further complains that the CRCC does not have any type of law library, which is denying him meaningful access to the courts. Attached to Plaintiff's Complaint is a copy of a grievance wherein Plaintiff complains about



being denied access to legal case materials, to which the Defendant McClease responds by telling Plaintiff to submit a request to a "Sgt. Reynolds" (apparently an officer with the GDC)" to obtain his "active legal documents", with Plaintiff also being asked to provide proof of all active court cases and time sensitive legal responses. Additional exhibits attached to Plaintiff's response memorandum also reflect that Plaintiff has complained about the CRCC opening his mail (Plaintiff threatens to contact the Postmaster General), and about Plaintiff not being given all of the stamps he wants. See Court Docket No. 69-1, pp. 11, 19. For their part, Adwell and McFadden both attest that they are not aware of any CRCC staff ever having withheld or tampered with Plaintiff's mail at any time, and that the CRCC also provides inmates with access to LexisNexis, including caselaw, statutes and regulations, in addition to employing an education specialist who is available to assist inmates with their legal rights. McClease further attests in his affidavit that regular mail is opened and checked by CRCC personnel for contraband, but that legal mail is delivered sealed to the Plaintiff, and that he has never withheld or tampered with any of Plaintiff's mail nor to his knowledge has any of the CRCC staff done so.

Nothing in the evidence before this Court shows a violation of a constitutional right. First, there is nothing improper about security officials opening mail to confirm that it does not contain contraband before delivering the mail to a prisoner. Couch v. Jabe, No. 11-34, 2012 WL 3043105 at * 7 (W.D.Va. July 25, 2012)["Prison officials undoubtedly have the right to screen mail entering a correctional facility to prevent the introduction of items that undermine security, good order, discipline, or rehabilitation."]. Further, while Plaintiff complains about not having received a magazine, Plaintiff own exhibit (Stage 1 Grievance Form attached to the Complaint) shows that Plaintiff's failure to receive a magazine he wanted was because of his custody status, not because



inmates/patients are not allowed to have magazines. see In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999) ["Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security'"] (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)); Overton v. Bazzetta, 539 U.S. 126, 132 (2003) ["We must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"]; Ramirez v. McCaughtry, No. 04-335, 2005 WL 2010173 (W.D.Wisc. 2005) [upholding policy that restricted access to newspapers, magazines, and photographs to inmates in segregation as part of an incentive system for good behavior].

    With respect to Plaintiff's legal mail and/or his claim concerning access to the Court, Plaintiff has provided no evidence whatsoever to support his general and conclusory claim that his legal mail is being improperly tampered with. House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]. Further, to the extent Plaintiff has intended to imply that the alleged conduct with respect to his legal mail has affected his access to the courts, Plaintiff has provided no evidence, or even argument, to show that any problems he is allegedly having with his legal mail has prejudiced him in any court proceeding. Magee v. Waters, 810 F.2d 451, 452 (4th Cir. 1987) ["Courts have required a showing by a complaining prisoner of actual injury or specific harm to him before a claim of lack of access to the courts will be sustained"]; Hause v. Vaught, 993 F.2d 1079, 1084-1085 (4th Cir. 1993); Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) [Dismissal of access to court claim proper where inmate



relied on conclusory allegations and failed to identify any actual injury].  The same is true with

respect to Plaintiff's "law library" claim.  Defendants have submitted evidence that Plaintiff has

access to LexisNexis as well as to an employee that helps patients with such matters, and while

Plaintiff denies that he has access to LexisNexis, even assuming this assertion to be correct for

purposes of summary judgment, there is again no evidence that Plaintiff has been prejudiced in his

legal filings.  To the contrary, the voluminous submissions by the Plaintiff in this case belie his claim

of hindered access to the Courts.  See Lewis v. Casey, 518 U.S. 343, 349-353 (1996)[Inmate alleging

denial of access to the courts must be able to demonstrate "actual injury" caused by the policy or

procedure at issue]; see also Johnson v. Reno Police Chief, 718 F.Supp. 36, 38 (D.Nd. 1989)["Even

a pro se plaintiff may not rely wholly on conclusory allegations, but rather must allege facts which,

if proven would entitle the plaintiff to relief"].  This claim is therefore without merit.

### (Remaining Claims)

The remainder of Plaintiff's assertions are essentially a hodge podge of varying

conclusory claims and allegations.  With respect to Plaintiff's complaint about his custody status or

having been initially been placed in a "strip-cell" upon his arrival at CRCC, these allegations in and

of themselves fail to state a viable claim because Plaintiff has no general constitutional right to

placement in any particular custody classification or status.  See generally, Slezak v. Evatt, 21 F.3d

590 (4th Cir. 1994) [the Constitution vests no liberty interest in inmates retaining or receiving any

particular security or custody status as long as the conditions or degree of confinement is within the

sentence imposed]; Neal v. Shimoda, 131 F.3d 818, 828 (9th Cir. 1997) ["[A] prisoner does not have

a constitutional right to be housed at a particular institution,..., [or] to receive a particular security

classification...."]; Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995) ["[A] prison inmate does not



21

have a protectable liberty or property interest in his custodial classification and an inmate's disagreement with a classification is insufficient to establish a constitutional violation."]; Allah v. Burt, No. 08-1538, 2010 WL 476016 at * 4 (D.S.C Feb. 3, 2010); cf. Goins v. Beard, No. 09-1223, 2011 WL 4345874 at * * 4-5 (W.D.Pa. Sept. 15, 2011)["Indeed, every court that has addressed this issue in Pennsylvania has determined that in the absence of exceptionally long periods of disciplinary custody (exceeding 15 months), prisoners do not have a liberty interest in remaining free from confinement in SMU or similar housing."](citations omitted); Estrada v. Kruse, 38 Fed. Appx. 498-499 (10th Cir. 2002)[No Eighth Amendment violation where Plaintiff was placed in stripped basement cell for 5 days where he suffered no injury and he did not show Defendants had evil motives or intent]; Kidwell v. Buchanan, No. 93-15056, 1993 WL 230224 at **1 (9th Cir. June 29, 1993) [Where temporary restriction of amenities was found not to be cruel and unusual punishment].

In order to state a § 1983 claim based on his initial placement in a strip cell and/or on suicide watch, or on his continued placement in a high custody status, Plaintiff would have to present evidence sufficient to show that the Defendants' decisions in his case were arbitrary, capricious, or based on some other unlawful motive. See generally, Sandin v. Connor, 515 U.S. 472, 478 (1995); cf. Marchesani v. McCune, 531 F.2d 459, 462 (10th Cir. 1976), cert. denied, 429 U.S. 846 (1976)[classification generally upheld unless inmate proves arbitrary and capricious or a clear abuse of discretion]; Crowe v. Leeke, 259 S.E.2d 614, 615 (1979).  Plaintiff has presented no such evidence.  Indeed, there does not appear to be any dispute in the evidence that Plaintiff's transfer to CRCC was due to his self mutilating behavior.  As such, his initial placement in a strip-cell pending evaluation with follow-up maintenance in a high custody capacity due to his self destructive propensities is hardly surprising. See Peckham v. Wisconsin Dep't of Corrections, 141 F.3d 694 (7th



Cir. 1998) [strip searches constitutional absent evidence they were performed for purposes of harassment or punishment]; cf. <u>Dixon v. Toole</u>, No. 04-183, 2006 WL 1038433 at * 5 (S.D.Ga. Apr. 13, 2006)[Holding that placement in a stripped suicide cell for two days did not violate "the minimal civilized measure of life's necessities."], <u>aff'd</u>, 225 Fed.Appx. 797 (11th Cir. Apr. 4, 2007); <u>Goins v. Weilenman</u>, No. 08-150, 2009 WL 211136 at * 3 (S.D.Ga. Jan. 28, 2009)[Noting that given inmate's past history of cutting his wrists, the inmates's placement in a strip cell was to protect him from harm]; <u>Michenfelder v. Sumner</u>, 860 F.2d 328, 332-333 (9th Cir. 1988) [strip searches when entering and leaving cells not excessive even if prisoner escorted from one portion of a unit to the next].  As for Plaintiff's Unit 3 custody status, again no constitutional violation has been shown. <u>Neal</u>, 131 F.3d at 828 ["[A] prisoner does not have a constitutional right to be housed at a particular institution,..., [or] to receive a particular security classification...."]; <u>Neals</u>, 59 F.3d at 533 ["[A] prison inmate does not have a protectable liberty or property interest in his custodial classification and an inmate's disagreement with a classification is insufficient to establish a constitutional violation."]; <u>Marchesani</u>, 531 F.2d at 462 [classification generally upheld unless inmate proves arbitrary and capricious or a clear abuse of discretion].

       The undersigned can also discern no violation of the Constitution even if, as Plaintiff claims, he is only allowed to shave and get a haircut once a month.[11]  Plaintiff's complaint that he was deprived of personal property while in the strip-cell also does not present a claim of constitutional magnitude.  <u>Lock v. Clark</u>, No. 90-327, 1992 WL 559660 at * 9 (N.D.Ind. Mar. 17,

---

[11]Assuming Plaintiff's version of the facts with respect to this issue to be true for purposes of summary judgment.  It is noted, however, that Adwell attests in his affidavit that CRCC brings in a barber to cut the inmates' hair and shave them, and that Plaintiff can request to see the barber for a haircut and shave, if he so chooses, but that due to Plaintiff's suicide risk and history as a "cutter" he is not allowed to have a razor to shave himself.



1992)["The deprivations alleged by [Plaintiff] in this case [which consisted of being confined for seven days in a 'strip cell' in a segregation unit, deprived of all personal property, including soap and hygienic items] fail to satisfy the objective component of his Eighth Amendment conditions claim, and they do not rise to a constitutional violation."].

                With respect to Plaintiff's complaints about his food, while prison inmates have a right to nutritionally adequate food, there is no evidence that that requirement is not being met in this case. The constitution does not guarantee that food be prepared and served in a pleasing manner; rather, the only requirement is that it meet prisoners' nutritional needs and not represent a health risk to the inmates. Shrader v. White, 761 F.2d 975, 986 (4th Cir. 1985); Williams v. Berge, 102 Fed.Appx. 506, 507 (7th Cir. 2004)["Prisoners have a right to adequate food, but not to food that is tasty or even appetizing"] (internal citations omitted). Here, while Plaintiff complains about his food, he has provided no evidence whatsoever to support his general and conclusory claim that the food service itself, or the actual food that he receives, has in any way violated his constitutional rights. House, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim]. The Defendant Meffert, a certified dietary manager and member of the Association of Nutrition and Food Service Professionals, has submitted a detailed affidavit wherein he attests that the food service and kitchen at CRCC are in compliance with the regulations and guidelines of several accrediting organizations. Meffert also sets forth in some detail the process of food delivery at the CRCC, as well as the dietary and caloric portions of the food provided, while Plaintiff's own exhibit (attached to his response memorandum) reflects that, with respect to his complaints about his meal portions and that he had lost weight, Plaintiff had an initial weight of 185, had then ballooned up to 199 on July 13, 2012, and was now back down to 178, which still classified him as being "overweight". See Exhibit



(Communication Form dated August 16, 2012), Court Docket No. 69-1, p. 10.[12]

No constitutional violation is shown in this evidence. The general and conclusory claims of Plaintiff's complaint that the food he receives is not properly served or in proper portions, without any supporting evidence, is simply not sufficient to create a genuine issue of fact with respect to this claim. Mays v. Springborn, 575 F.3d 643, 648 (7th Cir. 2009)[For diet claim, prisoner must show Defendant was deliberately indifferent to an objectively serious risk of harm and that the Defendants knew about it and could have prevented it but did not]; Bailey v. Kitchen, No. 08-141, 2009 WL 102534, at * 3 (D.S.C. Jan. 12, 2009)["Assuming a diet's nutritional adequacy, prison officials have the discretion to control its contents"]; Morgan, 829 F.2d at 12 ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"]. This claim should therefore be dismissed.

Plaintiff's claim concerning his outside exercise is similarly without merit. The Defendant has submitted evidence to show that, factors such as weather and behavior excepted, Plaintiff receives thirty minutes of outdoor recreational time in the morning and thirty minutes in the afternoon, five days a week. Further, even assuming Plaintiff's claim that he only gets two and one half hours of outside exercise a week to be true for purposes of summary judgment, that is still one half hour of outdoor exercise per day during the week (not including weekends). Hence, while Plaintiff would perhaps like to have more outside exercise, the undersigned does not find that a

---

[12]It is also noted that this Exhibit is dated over two months *after* Plaintiff filed this lawsuit.



genuine issue of fact of a constitutional violation has been presented, even assuming Plaintiff's version of the amount of outside recreation time provided to be correct.  See generally, Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997) ["only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement"]; Alberti v. Klevenhagen, 790 F.2d 1220, 1228 (5th Cir. 1986) [Eighth Amendment does not require "the provision of every amenity needed to avoid mental, physical, or emotional deterioration."].

Additionally, Plaintiff has presented no evidence to show that he has any restrictions on his ability to perform indoor exercise.  Chavis v. Fairman, No. 94-1503, 1995 WL 156599 at — 5-6 (7th Cir. Apr. 6, 1995)["Generally, even dramatic restrictions on outdoor exercise do not violate [the due process clause] so long as prisoners have ample opportunity to enjoy indoor activity."]; cf. Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)["In the context of a conditions-of-confinement claim, to demonstrate that a deprivation is extreme enough to satisfy the objective component of an Eight Amendment claim, a prisoner must 'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions', or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions"]; Davidson v. Coughlin, 968 F.Supp. 121, 129-130 (S.D.N.Y. 1997)[Discussing standard for evaluating whether exercise deprivation fell below objective standard of Eighth Amendment].

Plaintiff has also failed to present sufficient evidence to create a genuine issue of fact as to whether his First Amendment religious rights have been violated.  Various Defendants have attested as to why he is not allowed to have a necklace, and given the evidence before this Court showing Plaintiff's history of engaging in self-harming activities, there is certainly nothing unconstitutional about his not being allowed to have a necklace with an attached pendant, plastic or

26



not. Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) [Prison officials have legitimate penological interests in Administrative Segregation, and they must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"], reh'd denied, 75 F.3d 448 (9th Cir. 1995), cert. denied, County of Kern v. Anderson, 116 S.Ct. 306 (1995); In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d at 469 ["Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security'"] (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)); Miller v. Collier, No. 11-3728, 2012 WL 1739878, * 5 (D.Md. May 15, 2012)[No First Amendment violation by prison officials in confiscating cross due to fear it could be used to injure Plaintiff or others].

As for Plaintiff's desire to lead religious services, Greene attests that the standards and regulations of the correctional industry do not allow patients/inmates to perform or supervise religious services for safety/security reasons, and Plaintiff's own exhibit reflects these Defendants' safety concerns. See Exhibit (Patient Communication Form date May 27, 2012). Shabazz v. Arkansas Dep't of Corrections, 157 Fed.Appx. 944, 946 (8th Cir. Nov. 17, 2005)[Upholding restriction of not allowing Plaintiff to personally perform religious service "upon recognition that prison security may be jeopardized if an inmate is put in a position of religious leadership over other inmates, or if an inmate has the opportunity to use religious services to engage in disruptive communications."].

Again, nothing in the evidence before this Court shows a violation of any constitutional right, and Plaintiff's complaint that both Greene and McClease have told him that he could not possess a necklace and that no patient is allowed to perform religious services therefore



27

fails to state a viable constitutional claim.  Ajaj v. United States, 479 F.Supp.2d 501, 539 (D.S.C. 2007)["Courts have long held that religious practices may be restricted by prison authorities if the restrictions imposed are reasonably related to legitimate, penological interests . . . ."]; Sweet v. South Carolina Department of Corrections, 529 F.2d 854, 859 (4th Cir. 1975) (en banc) [describing federal court's deference to prison administrators and all administrative matters unless the condition rises to the level of a constitutional violation]; cf. Turner v. Safley, 482 U.S. 78, 89-90 (1987) [discussing four-factor test to be utilized when assessing reasonableness of regulation which impinges on a First Amendment right]; Savko v. Rollins, 749 F.Supp. 1403, 1409 (D.Md. 1990) [Limitation on the amount of in-cell religious reading material contained in prison regulation is constitutional under Turner standards];  O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987); Cruz, 405 U.S. at 319; Ali v. Dixon, 912 F.2d 86 (4th Cir. 1990), reh'g denied, 1990 U.S. App. LEXIS 18440 (4th Cir. 1990); Howard v. Smyth, 365 F.2d 428 (4th Cir.    ), cert. denied, 385 U.S. 988 (1966); Muhammad v. Lynaugh, 966 F.2d 901, 902-903 (5th Cir. 1992); Sanders v. Cherry, No. 91-1436, 1992 WL 146586 (7th Cir. June 26, 1992).

Finally, even if the Court were to consider this claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), no violation has been established.  The RLUIPA provides that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution unless the government demonstrates that imposition of the burden on that person 1) is in furtherance of a compelling governmental interest, and 2) is the least restrictive means of furthering that compelling governmental interest. See 2 U.S.C. § 2000cc-1(a). Here, Plaintiff has failed to present evidence sufficient to give rise to a genuine issue of fact that the Defendants have imposed a substantial burden on his religious exercise.  Even if he had, the evidence



28

also shows that Plaintiff was not allowed to have a necklace because of justifiable concerns about his welfare based on his past history of engaging in self-harming activities, and that prison security is a valid concern for not allowing inmates to exercise religious domination or control over other inmates. Cutter v. Wilkinson, 544 U.S. 709, *709 (2005) ["Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions and anticipated that courts would apply the Act's standard with due deference to prison administrator's experience and expertise."]; Hoevenaar v. Lazaroff, 422 F.3d 366, 367 (6th Cir. 2005) ["RLUIPA is similar to the Religious Freedom Restoration Act of 1993 (RFRA) in that the court must determine whether the plaintiff is likely to succeed in demonstrating that the regulation in issue imposes a substantial burden on his religious exercise. Assuming the Plaintiff makes this initial showing, the court next considers whether the regulations meet strict scrutiny, i.e., the regulation must be 'the least restrictive means' towards furthering 'a compelling government interest.' [citations omitted] Again, this test is the same as that previously imposed under RFRA."].

No substantial burden is set forth in the evidence presented, and there is also no evidence that Plaintiff is not otherwise able to worship pursuant to the dictates of his chosen religion. Hence, while controlling precedents make clear that an inmate's desire to practice his religion is not forfeited by virtue of their imprisonment, under the facts and evidence before this Court, Plaintiff has failed to establish a sufficient issue of material fact as to whether his constitutional rights have been violated to survive summary judgment, nor does the undersigned find that any violation has been established under the RLUIPA. This claim is without merit and should be dismissed.

### Conclusion

Based on the foregoing, it is recommended that the Defendants' Motion for summary



judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

March 4, 2013
Charleston, South Carolina



### Notice of Right to File Objections to Report and Recommendation

      The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

      Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29401

      **Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

